# EXHIBIT F

## (Deposition Excerpts of Christopher Thorpe Sr.)

Christopher Thorpe , Sr. - May 15, 2025

```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF UTAH - CENTRAL DIVISION


     JANENE THORPE, an             ) Deposition of:
     individual; CHRISTOPHER       )
     THORPE, SR., an individual;   ) CHRISTOPHER THORPE,
     CHRISTOPHER THORPE, JR., an   ) SR.
     individual; CHARLIE THORPE,   )
     an individual,                ) Case No.
                                   ) 2:23-cv-00242
          Plaintiffs,              )
                                   ) Judge David Barlow
     vs.                           )
                                   ) Magistrate Judge
     CEDAR HILLS CITY, a           ) Daphne A. Oberg
     government entity; AMERICAN   )
     FORK CITY, a government       )
     entity; AMERICAN FORK CITY    )
     POLICE DEPARTMENT, a          )
     government entity; DARREN     )
     FALSLEV, in his official      )
     capacity as AMERICAN FORK     )
     CITY POLICE CHIEF; C. SLATE   )
     BLACKBURN, in his official    )
     and individual capacities;    )
     PHILLIP W.S. CRAIG, in his    )
     official and individual       )
     capacities; JENNIFER L.       )
     NAKAL, in her official and    )
     individual capacities;        )
     KANDACE N. KONECHNY, in her   )
     official and individual       )
     capacities; SETH WIATE, in    )
     his official and individual   )
     capacity,                     )
                                   )
          Defendants.              )


                   May 15, 2025 * 10:02 a.m.

                   Videoconference Deposition

              Reporter:   Lisa Bernardo, CSR, RPR
```

Page 1

Christopher Thorpe , Sr. - May 15, 2025

that there's an only one-inch eave on any kind of house or shed or doghouse, even. They're clearly draining over onto the Thorpes' property. You can't play -- you can't play like you don't know when I've given you all the evidence and the information to do so, and it's McNeil Engineering at the top of the form.

Q. So just to back up, are you aware that Cedar Hills continued to have discussions with the Sanchezes about the exact marker placement of the boundary line between your property?

A. I know they did at first, but they haven't recently.

Q. Okay. Are you aware that the Sanchezes provided the city with surveying information --

A. The survey -- I'm sorry. Finish.

Q. No, you're fine. You know, demonstrating where they believe the property line was?

A. Yes. We had surveyors that didn't account for anything and it wasn't McNeil.

Q. And that was back in 2017?

A. Yeah.

Q. Let me fast forward it. I think you touched on it a little bit. After -- let me -- it's a clarifying question I have. Do you know when the

Page 94

parties entered their settlement agreement on the tree lawsuit?

A. So if I understand you correctly, when did we finally -- when did both the Thorpes and the Sanchezes come to a settlement?

Q. Yes.

A. I believe it was March 12th of 2020. I'm sorry. May 12th. May 12, 2020.

Q. Okay. And so was that -- did that settlement agreement occur, and I haven't seen that myself --

A. Okay.

Q. -- but did that settlement agreement include McNeil Engineering's most recent survey that you had mentioned earlier?

A. What do you mean, it included?

Q. Was it an exhibit to the settlement agreement?

A. Yes. Yes.

Q. And so that agreement said this is what we -- this is the boundary line we agree to?

A. Yes.

Q. Okay. And it had an exhibit from McNeil Engineering?

A. Yes.

Page 95

Q. Following that settlement agreement, did you contact the city about moving the shed?

A. Yes.

Q. When was that?

A. It was right after the settlement. And the city was like, you guys are in a lawsuit about this, you guys are in a civil matter about this, we are not getting involved. And I told them, it's done. It's over. Everything has been finalized. But again, no, no, no, we're got getting involved. We're not getting involved.

Q. Do you remember who you spoke to? Was it --

A. Yes.

Q. Sorry. Go ahead.

A. Jenny Peay.

Q. Jenny Peay. Was it a phone conversation? Was it an email conversation?

A. I believe it was an in-person conversation at the office.

Q. Okay. And you remember after you explained to her that the case has settled, she said to you this is a civil matter between you two?

A. Yes. So as I recall correctly, and I hope you were done, I don't mean to cut you off.

Page 96

Q. No, that's perfectly fine.

A. When I literally gave her multiple maps, multiple diagrams all from McNeil Engineering, showing specifically where everything was and where everything had been measured out, because McNeil did all the measuring and it clearly showed that their shed was still, like, within an inch from the property line. But, again, the narrow-minded biasness from the city is, like, they come out and they eyeball it. Well, it looks like it's not on their property to me. Okay. Well, that's why we hire engineers, you moron. And then I also showed them that their shed is still on stilts and that that is also a violation of the code of the city, that sheds need to be on a solid surface. Like, a firm, solid surface. On stilts, I've never heard anybody agreeing that a stilt is a solid surface. And it's still like that to this day. I've just kind of given up on it because, again, the city just doesn't do anything.

Q. So in that meeting, I guess this would have been in May of 2020; is that right?

A. Yes.

Q. In that meeting with Jenny Peay, that in-person meeting, she expressed to you we're not

Page 97

25 (Pages 94 - 97)

Christopher Thorpe , Sr. - May 15, 2025

going to do anything because this is a civil matter?
   A.   Yes.
   Q.   And nothing has been done to this day on that, correct?
   A.   Not a thing.
   Q.   Okay.  Have you brought it up with the city again since that May 2020 meeting?
   A.   I believe I have.  And I believe I actually put it into, again, that complaint form that I was telling you about at the beginning of our call, at the beginning of our talk.
   Q.   Okay.
   A.   There is a form that you go to to issue a complaint and I issued it to the new code enforcer, and I don't believe I even got a response.  Actually, I take it back.  I believe I did get a response and all they said is, yeah, we'll look into it, but, again, that's the same as no response.
   MR. FORD:  Hyrum, if we're at a good point, could we take a ten-minute break?  I apologize.
   MR. BOSSERMAN:  Yes.  Absolutely.
   MR. FORD:  Do you mind?  That would be helpful.
   MR. BOSSERMAN:  No, that's fine.  Thank

Page 98

you.
   (Break)
   Q.   (By Mr. Bosserman)  So we had gone through some of these incidences that we had talked about and talked about whether Cedar Hills was involved or not involved in each of them.  Are there any other incidences where Cedar Hills was involved that you recall?
   A.   You know, not that I recall right now.  I mean, you've got to understand there's been so much, it's overwhelming, but I can't think of anything else right now.
   Q.   Okay.  All right.  I want to just talk really quick about a few things.  Oh, real quick.  On a number -- you know, we talked on a number of the incidences that only American Fork police were involved in, you know, like the spraying of the water and some of the other ones that we talked about.  Do you remember having any conversations with Cedar Hills about the American Fork Police Department and their responses?
   A.   No.  I don't recall anything like that, no.
   Q.   Now, I'm going to show you what is your Second Amended Complaint.  I believe this is an

Page 99

exhibit already previously marked as Exhibit 3.  I'll put that up.  Let's see if it lets me.
   Can you see that, Mr. Thorpe?
   A.   Yes.
   Q.   This is the Second Amended Complaint, Verified and Demand for Jury.  I won't go through it all, but have you seen it before?
   A.   Yes.
   Q.   I just want to ask some really quick questions on this.  If we go down to paragraph 16, you will see there's an allegation on here related to the policies of Cedar Hills.  What policies are you aware of that Cedar Hills has that caused you harm?
   A.   You mean other than not abiding by their policies and being one-sided and biasness?
   Q.   Okay.  What policies do you know, are you aware of that Cedar Hills did not abide by?
   A.   The ones that we just discussed.  The ones by how they're not having the Sanchezes keep their shed on a solid surface and them having them on stilts.  By having their shed too close to the property line.  I mean, what we just literally discussed.
   Q.   So what you mean when you say policies is you mean their own laws?  Is that what you are

Page 100

saying, their own ordinances?
   A.   Yes.
   Q.   And then you also mentioned being biased?
   A.   Throughout the whole thing, yes.
   Q.   And your understanding, or, I guess, your assumption that they are biased stems from their relation or the mayor's relationship with the Sanchezes; is that correct?
   A.   I believe that's where it stems from, yes.
   Q.   Okay.  Any other policies?  You mentioned not enforcing the shed, I think is what you are referring to with it being on stilts, it being over the property line, not enforcing that.  Any other ordinances or policies that you don't believe Cedar Hills is abiding by?
   A.   Well, I mean, no.  Yeah.  I mean, again, also having their -- their lights shining up against our home.  Having their lights shining up into our bedrooms and in our home's windows.  I mean, that's three things right there.  Did you -- do you -- I mean, it's like literally everything we just discussed.
   Q.   Okay.  So, also, I guess, Cedar Hills' interpretation of their light ordinance?
   A.   Yes.

Page 101

26 (Pages 98 - 101)

Christopher Thorpe , Sr. - May 15, 2025

Q. Okay. Anything else besides those incidents?

A. I think that's good right there.

Q. Number 19, or, excuse me, let me look at my copy here. Number, yeah, 19. It's alleged that "Policies of AF City and AF Police directly caused the plaintiffs harm."

What policies of American Fork City and American Fork police do you believe caused you harm?

A. Well, I, again, also believe that there's an issue or a problem with their being unbiased. They have literally, every time the Sanchezes give them a call, they hear the first story first and they take their side. Clearly, the prosecutor doesn't agree with the American Fork Police Department, their foot soldiers, and, basically, has said, guys, stop. You know, dropped, dropped, dropped. No, no. No penalty. No penalty. I mean, what are you guys doing? You're making us look stupid by having all of these summonses thrown against the Thorpes and none of them are sticking. I mean, do we need to go put you guys back into, you know, POST again, because you guys clearly don't know what you're doing. But, you know, you would think that they would. And by them not knowing the law themselves and not knowing what

Page 102

they're supposed to be enforcing.

And that's the other thing that I really find discouraging is, you know, police officers are supposed to be peace officers. Not I take your side officers. Okay. You let the judge decide who's at fault and who's guilty of what. Okay. We are innocent. Innocent until proven guilty. And I think all of that alone, even just by itself, are policies that the American Fork Police Department have broken.

Q. Any other policies that you are aware of that you believe American Fork --

A. Oh, gosh, other than the incident on April 23rd of them breaking into the home without a warrant, assaulting my son, my wife, you know, causing PTSD on all of the four family members that were in the home at the time, literally watching the American Fork police officers attack my wife and their mother just because they wanted a signature. You don't think that's a violation of a policy? That's a violation of the Constitution.

Q. Now, I'm going to go to, let's see, paragraph 60. I'll scroll down here. So in this paragraph 60 of the Second Amended Complaint, it says that "Cedar Hills, AFPD, AFPD officers took on early sides supporting and encouraging the Sanchezes'

Page 103

actions and actively participating in the Sanchezes' actions against the Thorpes." Do you see that?

A. I do.

Q. My question has to do with Cedar Hills, specifically. What has Cedar Hills done to encourage the Sanchezes' actions?

A. So I believe this is more so along the lines of where Cedar Hills, American Fork PD and American Fork PD officers are all taking sides. Again, I am sorry to be redundant, but just like we've just discussed, they have clearly not handled their ordinances and their codes correctly. They have clearly shook me off and they've blown me off and said, we're not helping you. And the thing is that what people don't understand is that by indirectly not doing anything encourages them to behave poorly, the Sanchezes to continue to behave poorly.

Like, oh, we see that the -- that the entire American Fork Police Department is on our side. Well, we also are seeing that the entire Cedar Hills is on our -- staff, or I don't know what you call them, people, sorry, the Cedar Hills people in the office are clearly on our side, also. So let's continue to issue complaints, issue concerns. We'll

Page 104

make up some sort of trash complaint in their backyard just to make it look like the Thorpes are the bad guys again. And we'll call them out a second time and have Jenny Peay issue a second complaint. Oh, oh, I'm sorry, you guys have already taken care of it. But, you know, the Sanchezes are complaining, so I'm taking care of it. So there's a lot of biasness. The biasness has literally just got to stop.

And like I've told the American Fork PD, and like I've told the City of Cedar Hills, the employees, is I don't want you to take sides. I just want you to enforce the codes. Do what the code says and everything takes care of itself. Don't take my side. Don't take their side. Enforce the code. The code on the shed. Multiple codes on the shed. I mean, just enforce the codes. Stop being biased.

Q. Okay. If you look at number 65 here, it says, "Cedar Hills, AFPD, AFPD officers never investigated who owned the lower backyard," okay?

A. Okay.

Q. Do you believe that is true, Cedar Hills never investigated who owned the lower backyard?

A. They specifically said they didn't.

Q. Is the lower backyard where the shed is?

Page 105

27 (Pages 102 - 105)

Christopher Thorpe , Sr. - May 15, 2025

A.   It's where the shed was.  And I guess where the shed is now, yes.

Q.   And it's your testimony that Cedar Hills never investigated --

A.   I believe at the very, very, very beginning, Jenny Peay said, I will look into it.  But then when she looked into it, she's like, no, no, no, I -- this is way above my scope, I can't do anything about it.  And I'm like, okay, whatever.  But now that I have given you a survey and now that I have given you multiple diagrams and, what do you call it, maps of the survey, from the source that we all have to use, and it clearly shows that she has everything laid out.  She doesn't have to do a whole lot, doesn't really have to lift a finger except look at the map.  She didn't want to lift a finger.  She didn't want to do anything.  She's like -- this is like an easy way for her to say, shhh, we're not helping, we're not helping, forget it.

Q.   So I guess if I sum up your testimony, it would be that Cedar Hills originally investigated the shed, but since that May 2020 meeting has not investigated who owns the lower backyard?

A.   Their -- their initial investigation was piss-poor, and I mean that literally.  They literally

Page 106

came out, took a look at it, walked away.  That's not an investigation.

Q.   Number 66, if you can see on the screen here.  "Cedar Hills, AFPD, AFPD officers threatened the Thorpes with fines, citations, and arrest for the Thorpes' use of their own property."

Do you see that?

A.   Yes.

Q.   Do you believe that Cedars Hills threatened you with fines?

A.   I don't remember if there was a fine per se, but I think that there was a fine of -- on that -- on that letter exhibit that you showed us on where Jenny Peay was issuing the complaint letter, I think it was.

Q.   Okay.

A.   And I think it said something to the effect of like, if you don't do it within the next number of days, we're going to come in and do it for you.

Q.   Okay.  So that is what you are referring to there, that you were threatened on that --

A.   Yes.

Q.   -- incident with the issue in your backyard?

Page 107

A.   Yes.  We were threatened with a fine, yes.

Q.   Any other times you were threatened with a fine by Cedar Hills?

A.   Not that I recall right now.

Q.   Let's see.  I'm going to move on to paragraph 77.

A.   Actually, can I -- can I digress?  I want to go back to the last question.  I do remember now there was another incident where we were threatened with a fine.  We had our trailer that was parked in front of our house on the street close enough to the curb that it was legal.  We had -- we had it there less than -- less than six hours and we got threatened, like, you move this or you will be fined.

Q.   Okay.

A.   That was the second incident.  But it was quick and easy and simple.  We took care of it again.  Again, we just moved it back up onto our driveway.  And, as I recall, I think you have to have it there, at the time, I think, was, like, if it is there more than, like, 48 hours.  Forty-eight, you'll get in trouble.  We literally had it there less than six hours and we already got a thing on our -- like a tag on our trailer.  And, again, I'm going to tell you the reason I believe that that was an issue is

Page 108

because the Sanchezes are friends with the Andersens.  The Andersens live up the street.  The Andersens live up the street.  Denise Andersen drive -- can basically drive by -- the direct line of sight from Denise Andersen to get to work, the mayor's office, goes right past our house every single day.  If we had our trailer there for four hours, three hours, six hours, I can see her saying, Jenny, go give the Thorpes a ticket or a tag, and that's -- that's the way it tends to be all the time with Denise Andersen.

Q.   Okay.

A.   I'm sorry.  What was your next question?

Q.   No, you're fine.  I actually wanted to follow up with a question there.  Do you remember when that -- was it like a warning that you got on the trailer?

A.   Well, yeah.  I mean, they're all warnings.  They're all warnings that you're going to get a fine.  But you have it was a fine and so, I mean, I think we've gotten like half a dozen of them.  I mean, we've got like a half dozen, but we've gotten to the point we just don't park the trailer on the street anymore even though it's legal and lawful.  We just don't park it on the street anymore because we're tired of the harassment.

Page 109

28 (Pages 106 - 109)