# EXHIBIT G

## (Deposition Excerpts of Janene Thorpe)

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

JANENE THORPE, an individual; )
CHRISTOPHER THORPE, SR., an    ) Case No.
individual, CHRISTOPHER        ) 2:23-cv-00242-AMA-DAO
THORPE, JR., an individual;    )
CHARLIE THORPE, an individual, ) Judge David Barlow
                               ) Magistrate Daphne A. Oberg
        Plaintiffs,            )
                               )
     v.                        ) Hybrid Videoconference
                               ) Video-Recorded Deposition
CEDAR HILLS CITY, a government ) of:
entity; AMERICAN FORK CITY, a  ) JANENE THORPE
government entity; AMERICAN     )
FORK CITY POLICE DEPARTMENT, a )
government entity; DARREN       ) March 7, 2025
FALSLEV, in his official        ) 9:11 p.m. to 2:56 p.m.
capacity and individual         )
capacity as AMERICAN FORK       )
POLICE CHIEF; C. SLATE          ) Witness location:
BLACKBURN, in his official and ) HEIDEMAN & ASSOCIATES
individual capacities; PHILLIP ) 2696 North University
W.S. CRAIG, in his official     ) Avenue, Suite 180
and individual capacities;      ) Provo, Utah 84604
JENNIFER L. NAKAI, in her       )
official and individual         )
capacities, KANDACE N.          )
KONECHNY, in her official and  )
individual capacities; SETH     )
WIATE, in his official and      )
individual capacity; and JOHN  )
or JANE DOES, 1-15, in their    )
individual and/or official      )
capacities,                     )
                                )
        Defendants.             )
                      * * *

                      * * *

                 Rossann J. Morgan
              - Certified Court Reporter -
            - Registered Professional Reporter -
                 Job No. CRCC7156192

Page 138

Q. Okay.

A. And I really want to leave that up to my husband to talk. I'm starting to lose my voice. And they -- they're very vindictive. And so...

Q. Okay. Well, I don't want to take up -- take up all of your voice here. Can you just --

A. Yeah.

Q. Can you give me, generally, what you understood happened --

A. They --

Q. -- with that incident?

A. Yeah. They -- they just wanted to try to -- can -- can you ask my husband about that?

Q. Sure. I -- I definitely will. Sorry. I -- I hate to sound kind of like a broken record.

A. Okay.

Q. All I -- all I'm asking is --

A. Because -- yeah.

Q. -- for your recollection.

A. Okay.

Q. If you don't have any, or you don't know, that's fine. I'll -- I'll definitely ask him. Just what you recall what happened with that incident.

A. I just -- I just remember it was them trying to sue us over trees and they -- it was not a very --

Page 139

they didn't -- they didn't get what they wanted and it was just not a good thing. And they have just been vindictive ever since, so...

Q. So that -- that incident resulted in a lawsuit; is that correct?

A. Yeah. Yes.

Q. What was the outcome of that lawsuit? Do you remember?

A. It actually just created a monster of them and they didn't win.

Q. Okay. The last one I have on this -- on my list here is an incident with allegations over spraying water. Do you remember that?

A. Yes. So the spraying water -- the trees down below -- so the -- the trees -- so you've got to understand. Nobody understands this. They -- they took the property -- they tried to take -- they tried to take the property down below. And when they first moved -- moved here to their -- to their home, they -- they tried to take 15 feet of property, and that's why they put the shed on the wrong property.

So we got the property back and they planted the trees right on our property. When we got the property back, it was told -- we were told that we had to keep the trees alive. I was watering the trees.

Page 140

Whenever they see us out in our backyard, they think that they can just come out there and intimidate us, call us names, anything they can do.

I was watering the trees and he got into the waterline -- into the water stream -- up into the waterline, because there's not a real fence and he got into the overspray of the water. Does that make sense?

Q. Yeah, it does. And "he" is Mr. Sanchez; that right?

A. Yes.

Q. Okay.

A. And -- yeah. And he still wore the same clothes for the rest of the day because even when the police came, he was still wearing the same clothes.

Q. Okay. Do you remember that the police got involved in that incident?

A. Uh-hmm.

MR. PEAT: Verbal.

THE WITNESS: Yes. Yes.

Q. (BY MR. BOSSERMAN) Okay. And -- and I assume -- I guess, do you know who called the police?

A. I don't know which one of them called the police, no.

Q. But you believe it was the Sanchezes?

A. Yes.

Page 141

Q. Okay. Do you know if -- was Cedar Hills contacted about that?

A. I don't know.

Q. Okay. You don't remember contacting Cedar Hills about that?

A. No.

Q. Okay. What was the outcome of that spraying water incident?

A. You know, honestly, I think it was just -- I'm not sure exactly. I think it was dropped.

Q. Okay. Do you --

A. But we --

Q. Nobody in your family was charged with anything --

A. I don't believe so.

Q. Okay. Do you know when that incident occurred? Sorry, I should have asked that. Do you know --

A. Yeah.

Q. -- the timeframe?

A. I think it was October of 2020.

Q. Okay. And I just -- sorry. Going back. I neglected to ask, on the -- on the -- the tree -- the alleged tree-killing incident, do you know what -- if -- whether Cedar Hills was involved in that dispute at all?

36 (Pages 138 - 141)

Page 142

A. I don't think so.

Q. Okay. Do you know if American Fork police got involved in that?

A. You know, they would come out for -- you know, I don't know. I'm not sure.

Q. Okay. Okay. Great. Well, I just have a few more questions. In -- in paragraph 16 of the operative complaint, there's a mention about how -- there's a mention in there about the policies of Cedar Hills causing harm. I just wanted to ask you what policies are you aware of, of Cedar Hills, that has caused you or your family harm?

A. I'm not sure. Can you rephrase that?

Q. Sure. Are -- I guess I'll start with -- this way. Are you aware of any policies of Cedar Hills?

A. You know, I'm aware of some of the policies; but we -- you know, I'm not really aware of everything.

Q. Okay. What -- what policies are you aware of?

A. Just the -- the basics, I guess.

Q. What do you mean by that?

A. Well, I mean, like, about doing -- about, like, you know, how you should live and taking -- doing the trash and about keeping up your yards and, you know --

Page 143

Q. Okay.

A. -- things like that. Like, the basics.

Q. Okay. Okay.

A. And, you know -- you know, things like that. And keeping your yards trimmed back and things like that. But -- and I don't have any small children. I don't have children anymore. So my husband and I really kind of do our own thing. And I don't mean, like, we just don't care. We are into our own things. And --

Q. Okay.

A. -- into things with our children and our family and different -- into a different category, I guess. So when you're telling me -- you're asking me about these policies, what do you mean?

Q. Okay. I think I understand. I think if I can sum it up, you -- you are aware generally of, you know, Cedar Hills' policies or rules or how -- how it -- you know, a city should function.

What I'm kind of looking for specifically is, are you aware of any policies of Cedar Hills directly tied to this incident? So, for example, policies governing how police officers should -- how police officers should act. Are you aware of any Cedar Hills policies to that effect?

A. I am, yes.

Page 144

Q. Okay. And how -- are these written policies that you've seen?

A. I guess I've seen written and I -- and it's just common knowledge too.

Q. Okay. What written policies have you seen?

A. Things that my husband has pulled up.

Q. From Cedar Hills specifically?

A. Yes.

Q. Okay. Do you recall what the title of those policies were?

A. No.

Q. Okay. And do you recall what those policies say?

A. Not offhand.

Q. Okay. Do you -- in this -- in -- in the complaint, you specifically allege that the policies of Cedar Hills directly cause Plaintiffs harm. What policies are you referring to?

A. Well, you know, that fact that -- the fact that I have lights going into my bedroom windows, the fact that I feel that I can't -- I have to worry that the police will maybe come and batter me up if I don't do something right, or that the Sanchezes can call the police on me and I still have to worry. I mean, is that what you're talking about? I mean, I'm trying to figure

Page 145

out.

Q. Yeah, I guess --

A. I'm not --

Q. I guess I'm just trying to get at what specifically do you believe is, you know, some sort of regulation, ordinance, policy, procedure at Cedar Hills that has caused you harm?

A. I don't feel safe. I have to worry about my neighbors not doing the right thing.

Q. And -- and you attribute that to some policy at Cedar Hills?

A. Well, Cedar Hills has policies in their books, and then they're not helping to encourage them to follow these policies. I mean --

Q. Yeah, I --

A. -- you don't --

Q. Sorry.

A. No, go ahead.

Q. Yeah. I guess that's what I'm trying to understand. What -- when we say they -- there's these policies out there and Cedar Hills need to enforce them or they're not following them, I'm trying to understand what policies specifically you're talking about.

A. Their lights.

Q. Okay. Lighting?

37 (Pages 142 - 145)

Page 146

A. I mean --

Q. Okay. Lighting?

A. Their lights. Yeah. Their lights.

Q. Lighting. What -- what other ones?

A. Knowing that we have decent officers that -- you know, that are patrolling and they're are not going to hurt us.

Q. Okay.

A. I mean, I'm sure there's a list of them; I just -- I just can't think of them offhand.

Q. Fair enough. With respect to this last one that you mentioned of, you know, having officers, do you -- when you've had negative interactions with, for example Officer Nakai, have you called Cedar Hills and complained to Cedar Hills about those negative interactions?

A. How am I supposed to complain to Cedar Hills about that when Cedar Hills -- well, tell me what I'm supposed to do.

Q. Oh, sorry. I -- I'm just asking. Do you remember calling Cedar Hills and complaining to them about their -- about American Fork Police Department?

A. No.

Q. Okay. Let me ask this. There is an allegation in the complaint that we looked at yesterday

Page 147

talking about Cedar Hills taking the side of the Sanchezes over the Thorpes. Do you remember that?

A. I don't recall, but probably.

Q. Let's see here. I'm going to just quickly -- it will be faster this way. If I can share my screen, I --

MR. BOSSERMAN: Michael, I don't know if you've got that -- let's see if I can. Oh, I'm sending the request now. Let's see if I can share my screen here. Okay. I think I got it. Let's see.

Q. (BY MR. BOSSERMAN) Can you -- can you see this in front of you? This is a -- let me scroll to the top. I want to make sure the right screen's up. Do you see this is the Second Amended Complaint Verified and Demand for Jury. Do you see that?

A. Yes.

Q. Okay. So this is what was yesterday entered into as Exhibit 3. I just want to ask you - I've got about four more questions and I'm done - do you see right here, paragraph 60 here? This paragraph alleges that "Cedar Hills, AFPD and AFPD officers early on took sides supporting and encouraging the Sanchez's actions."

Just wanted to ask you, what is your understanding -- how do you know that Cedar Hills took sides supporting and encouraging the Sanchez's actions?

Page 148

A. Well, we actually have it on -- we could actually show it to you on -- on their -- their cameras when -- when -- when Officer Nordin goes to their home and says -- actually uses the phrase -- and I'm sorry, I'm not saying it completely word for word -- and says he's going to a meeting and "We all are on" -- says to the Sanchezes, "We are all on your side."

Q. Okay. And so I would just want to back up. You -- you've seen a video where Officer -- did you say Norman?

A. Nordin. Nordin.

Q. Oh, Nordin. Okay. Officer Nordin is speaking with who?

A. To the Sanchezes.

Q. Okay.

A. Probably Ted.

Q. Okay.

A. I'm sorry, Ed. The -- mister --

Q. Ed.

A. I should say "Mr. Sanchez."

Q. Okay. And Officer Nordin says something to the effect of, "We are on your side"?

A. No, not to the effect. He says it. "We are all" --

Q. So he --

Page 149

A. -- "on your" --

Q. Okay.

A. Yes.

Q. "We are all on your side." Okay.

A. Yes.

Q. Do you know, in that video, is -- other than Officer Nordin, is there anybody there from Cedar Hills?

A. What do you mean is there anyone there from Cedar Hills?

Q. In that -- in that video -- or when Officer Nordin said that, do you know -- is -- was there, you know, like, Jennifer Peay there or --

A. No.

Q. -- a code --

A. No.

Q. -- enforcement officer?

A. No.

Q. Okay.

A. He's just there at their home and he's wearing his body cam.

Q. Okay.

A. Like, you know, their -- their camera on them?

Q. Sure.

A. And he goes over to talk to them, and he's

Court Reporting Cost Containment    1-866-318-1233
A Veritext Company    www.veritext.com